UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 25-12069-GW-Ex | Date | September 9, 2026 |
| Title | *Amy Louise Taylor v. Jamie Nelson Studios LLC, et al*. | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| | | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Present | None Present |

**PROCEEDINGS: IN CHAMBERS - TENTATIVE RULING ON DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT [109]**

Attached is the Court's Tentative Ruling on Defendants' Motion [109], set for hearing on September 14, 2026 at 8:30 a.m.

: 

Initials of Preparer JG

***<u>Amy Louise Taylor v. Jamie Nelson Studios LLC et al.</u>***, Case No. 2:25-cv-12069-GW-(Ex)
Tentative Ruling on Motion to Dismiss Second Amended Complaint

Before the Court is Defendants' Jamie Nelson Studios LLC ("JNS") and Jamie Nelson's ("Nelson") (collectively "Defendants") Motion to Dismiss Second Amended Complaint (the "Motion"). *See* Motion, Docket No. 109. The Court has considered the Motion, Plaintiff Amy Louise Taylor's ("Plaintiff") opposition ("Opp," Docket No. 111), Plaintiff's Second Amended Complaint (Docket No. 102), and Defendants' reply ("Reply," Docket No. 120). For the reasons stated herein, the Court would **GRANT-IN-PART** and **DENY-IN-PART** the Motion.

## I. <u>Background</u>

On December 22, 2025, Plaintiff filed suit against Defendants, alleging, among other things, that Defendants used and sold photographs containing Plaintiff's name, image, and likeness without her permission. *See generally* Complaint, Docket No. 1. Plaintiff alleges that she is the "globally renowned singer and songwriter" of the "Grammy-nominated band, Amyl and the Sniffers (the 'Band')." *Id.* ¶ 9. It is averred that the Band's manager initially contacted Defendants about their photographing Plaintiff and the Band for use in the Band's upcoming album as well as for other purposes; but an agreement could not be reached. *Id.* ¶¶ 13-14. Months later, Nelson contacted Plaintiff to request that Plaintiff posed for a photoshoot conducted by Defendants with the "express" intention that those resulting images of Plaintiff (the "Subject Photographs"), along with her name and likeness, would be "published exclusively in the July 2025 issue of *Vogue Portugal*." *Id.* ¶ 15. Plaintiff agreed to that photoshoot and concomitantly implicitly authorized the release of the photographs, but only for purposes of their appearance in *Vogue Portugal*. *Id.* ¶¶ 16-19. The photoshoot was conducted in May 2025, and several of the resulting images appeared in the July 2025 issue of *Vogue Portugal*. *Id.* ¶ 20. In September of 2025, Nelson contacted Plaintiff seeking permission to sell "fine art prints" and "zines" from the Subject Photographs on the Defendants' websites. *Id.* ¶ 21. Plaintiff refused to give her permission in no uncertain terms. *Id.* ¶¶ 23-24. Despite the denial of such permission, Defendants began placing Subject Photographs on their websites and selling them. *Id.* ¶¶ 25-27.

In her original Complaint, Plaintiff brought three causes of action: (1) false association in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) statutory misappropriation of publicity in violation of Cal. Civ. Code § 3344; and (3) common law misappropriation of name or likeness.

*See generally id.* On January 28, 2026, Defendants filed an Answer.[1] *See* Docket No. 15. On February 16, 2026, Defendants (in pro se status) filed an Amended Answer which included a Counterclaim against Plaintiff and the Band (collectively "Counter-Defendants") for copyright infringement in violation of 17 U.S.C. §§ 501 et seq., claiming that they placed Defendants' copyrighted photographs on social media without permission or license.[2] *See* Docket No. 19. On February 24, 2026, Nelson (in pro se status but for herself only) filed a First Amended Counterclaim ("FACC") which added PHC Films Pty Ltd as a counter-defendant. *See* Docket No. 28.

On February 17, 2026, Defendants filed a Motion to Strike the Complaint Pursuant to California's anti-SLAPP statute ("Anti-SLAPP Motion"), *see* Anti-SLAPP Motion, Docket No. 21, and a Motion for Judgment on the Pleadings ("MJP"), *see* MJP, Docket No. 23. On March 18, 2026, the Court issued a "Tentative Ruling" which denied without prejudice the Anti-SLAPP Motion, granted with prejudice the MJP as to Plaintiff's federal Lanham Act cause of action, and dismissed without prejudice Plaintiff's remaining state law claims because the Court declined to exercise supplemental jurisdiction over them. *See generally* Tentative Ruling on Plaintiff's Anti-SLAPP Motion and MJP ("Tentative Ruling"), Docket No. 45. Following the hearing on these motions, the Court took them under submission (*see* Docket No. 46). On May 4, 2026, Plaintiff was granted permission to file a First Amended Complaint ("FAC," *see* Docket No. 85), and the FAC was filed on June 1, 2026. *See* Docket No. 86. On June 1, 2026, the Doniger/Burroughs PC law firm entered an appearance as attorneys of record for Defendants. On June 12, 2026, the parties stipulated to permit Defendants' filing a Second Amended Counterclaim ("SACC," *see* Docket No. 94). On June 15, 2026, the Court: (1) gave leave for Plaintiff to file a Second Amended Complaint ("SAC") by June 22, 2026; (2) granted the stipulation for Defendants' filing a SACC; and (3) in light of the above provisions, denied the Defendants' Anti-SLAPP and MJP motions as being moot at that point. *See* Docket No. 95. On June 16, 2026, Defendants filed their SACC

---

[1] Initially, Defendants had not retained counsel and Nelson filed the Answer for both Defendants. *See* Docket No. 15.

[2] The initial Counterclaim also named as a counter-defendant John Angus Stewart ("Stewart") who was described as "an individual who reproduced and publicly displayed copyrighted photographic works on social media." Docket No. 19 at 7.

which contains two causes of action for copyright infringement and declaratory judgment.[3] *See* Docket No. 97. On June 22, 2026, Plaintiff filed her SAC which contains four causes of action for: (1) false association in violation of the Lanham Act, (2) misappropriation of publicity under Cal. Civ. Code § 3344, (3) common law misappropriation of name/likeness, and (4) breach of implied license. *See* Docket No. 102.

On July 13, 2026, the following motions were filed: (1) Plaintiff's Motion to Dismiss the SACC (*see* Docket No. 106); (2) the Band's joinder in Plaintiff's Motion (*see* Docket No. 107); (3) the Band's Motion to Dismiss the SACC for lack of personal jurisdiction (*see* Docket No. 108); and (4) the present Motion (*see* Docket No. 109).

## II. Legal Standard

Under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with FRCP 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under Rule 12(b)(6), the court must: (1) construe the complaint in the light most favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The court need not accept as true "legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). In its consideration of the motion, the court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable, and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Johnson v. Riverside*

[3] The SACC dropped Stewart and PHC Films Pty Ltd as counter-defendants. *See* Docket No. 97.

*Healthcare Sys., LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008); *see also Twombly*, 550 U.S. at 561-63 (dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief). However, a plaintiff must also "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Johnson*, 534 F.3d at 1122 (quoting *Twombly*, 550 U.S. at 570); *see also William O. Gilley Enters., Inc. v. Atlantic Richfield Co.*, 588 F.3d 659, 667 (9th Cir. 2009) (confirming that *Twombly* pleading requirements "apply in all civil cases"). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. <u>Discussion</u>

### A. Lanham Act Claim

Plaintiff's first cause of action is "False Association in Violation of the Lanham Act, 15 U.S.C. § 1125(a)." *See* SAC ¶ 50. Plaintiff alleges that "Defendants violated the Lanham Act by commercially exploiting [Plaintiff's name, image, and likeness ("NIL")] by making it the main focal point of Defendants' promotional Facebook and Instagram postings and merchandise aimed at fans of [Plaintiff's] work." *See id.* In engaging in the alleged conduct, "Defendants falsely or misleadingly represented to consumers Plaintiff's affiliation with and/or endorsement of Defendants' commercial enterprises, products, and photography services." *Id.*

Section 43(a) of the Lanham Act provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's

> goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "Under § 1125(a)(1)(A), the Ninth Circuit has held that the unauthorized use of a celebrity's persona, image or likeness, may be brought as a false endorsement claim." *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 972 (S.D. Cal. 2020) (collecting cases). However, the Lanham Act "prohibits only *false endorsement*, not mere use of an image or name." *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1214 (C.D. Cal. 2000) (emphasis in original) (citation omitted). "Only uses which suggest sponsorship or approval are prohibited." *Id.* "Under the law of false endorsement, likelihood of customer confusion is the determinative issue." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002) (citing *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997)). "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (citation omitted).

In general, claims brought under the Lanham Act are governed by an eight-factor "likelihood-of-confusion test."[4] *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017) (citing *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)). In cases involving expressive works, however, the protections afforded under

---

[4] These factors, as applicable to a celebrity case, include:

1. the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended;
2. the relatedness of the fame or success of the plaintiff to the defendant's product;
3. the similarity of the likeness used by the defendant to the actual plaintiff;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent on selecting the plaintiff; and
8. likelihood of expansion of the product lines.

*Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001). "Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case." *Id.* at 1008. The Ninth Circuit has also noted that the "Lanham Act's likelihood of confusion standard is predominantly factual in nature." *Id.* (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997)).

trademark laws must also be balanced against First Amendment rights. *See Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013). In such cases, therefore, a plaintiff pursuing claims under the Lanham Act must instead overcome the test articulated in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which was adopted by the Ninth Circuit in *Mattel*, 296 F.3d at 901-02, and *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).[5] To be clear, "[t]he *Rogers* test is reserved for expressive works."[6] *Brown*, 724 F.3d at 1241. The Ninth Circuit "does not apply § 43(a) of the Lanham Act to expressive works 'unless the [use of the trademark or other identifying material] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use of trademark or other identifying material] explicitly misleads as to the source or the content of the work.'" *Hara v. Netflix, Inc.*, 146 F.4th 872, 877 (9th Cir. 2025) (alterations in original) (quoting *id.* at 1239).

The Supreme Court in *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023), held that using the *Rogers* test "is not appropriate when the accused infringer has used a trademark to designate the source of its own goods – in other words, has used a trademark as a trademark." *Id.* at 145. In *Jack Daniel's*, because the makers of the Bad Spaniels toy "used the marks derived from Jack Daniel's in that way" – that is, in the source-identifying way of a trademark – the *Rogers* test did not apply and "the infringement claim . . . r[ose] or f[ell] on likelihood of confusion." *Id.* at 153. Following *Jack Daniel's*, the Ninth Circuit in *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022 (9th Cir. 2024), found that AJ Press used the "Punchbowl" mark in connection with its *Punchbowl News* to "designate the source of its own goods – in other works, ha[d] use a trademark as a trademark" and thus "h[e]ld that *Rogers* d[id] not apply." *Id.* at 1031. Although recognized as "a cabined doctrine," the *Rogers* test remains appropriate in cases "in which a trademark is used not to designate a work's source, but solely to perform some other expressive function." *Jack Daniel's*, 599 U.S. at 154-55. In *Mattel*, for example, the Ninth Circuit applied the *Rogers* test because a band's use of the Barbie name in the title of its song "Barbie Girl" was "clearly relevant

---

[5] Although *Mattel* adopted the *Rogers* test in the context of using a trademark in the title of an artistic work, *E.S.S.* clarified that the *Rogers* test also applies in cases where the trademark is used in the body of an expressive work. *See E.S.S.*, 547 F.3d at 1099.

[6] The Supreme Court described the two prongs of the *Rogers* test as follows: "the so-called *Rogers* test requires dismissal of an infringement claim at the outset unless the complainant can show one of two things: that the challenged use of a mark 'has no artistic relevance to the underlying work' or that it 'explicitly misleads as to the source or the content of the work.' *Rogers v. Grimaldi*, 875 F. 2d 994, 999 (CA2 1989)." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 151 (2023).

to the underlying work, namely, the song itself" and "d[id] not explicitly mislead as to the source of the work; it d[id] not, explicitly or otherwise, suggest that it was produced by Mattel." *Mattel*, 296 F.3d at 902.

"[T]he defendant must first 'make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.'" *Punchbowl*, 90 F.4th at 1028 (citing *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018)). This Court previously found (at least initially) that the *Rogers* test applies to Defendants' works. *See* Tentative Ruling at 7-14 of 15. The Court's review of the SAC, the exhibits cited therein, and the parties' briefing have provided no reason for the Court to deviate from its previous conclusion.

While Defendants have shown as a threshold matter that their use of the Subject Photographs is part of an expressive work, "the Lanham Act does not apply unless 'the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work.'" *Punchbowl*, 90 F.4th at 1028 (citing *Mattel*, 296 F.3d at 902). Previously, the Court found the Lanham Act to be inapplicable under prong two of the *Rogers* test, because Plaintiff's allegations "including the alleged advertisements and the underlying products offered for sale" did not evidence any "'explicit indication,' 'overt claim,' or 'explicit misstatement' that would cause consumer confusion." Tentative Ruling at 14-15 of 15.

Plaintiff avers that "the SAC materially expands the factual allegations supporting Plaintiff's false endorsement claim" and that "[a]ccepting those allegations as true . . . Plaintiff has plausibly alleged that Defendants' commercial use of her identity explicitly misled customers into believing Plaintiff endorsed, sponsored, or collaborated in Defendants' commercial venture." Opp. at 13; *see also* Opp. at 14 (citing SAC ¶¶ 40, 50-58, 67). The Court, having reviewed the SAC and accompanying exhibits, is not persuaded that these "expand[ed] [] factual allegations" move the needle.

While Plaintiff has certainly included more discussion in its pleadings, the underlying alleged facts, namely Defendants' products and marketing copy directed at those products, remain virtually entirely unchanged. *Compare* Exs. A-G to the Complaint, Docket Nos. 1-1 to 1-7 *with* Exs. A-G to the SAC, Docket Nos. 102-1 to 102-7. For example, the Court already considered Defendants' naming the product series at issue "Champagne Problems: Amy Taylor," *see* SAC ¶ 56, in reviewing the initial Complaint's exhibits. *See* Ex. F to Complaint ("Ex. F to Initial Complaint), Docket No. 1-6. Likewise, the Court has already considered the marketing copy, *see*

SAC ¶ 41, associated with Defendants' products. *See* Ex. F to Initial Complaint at 1 ("The series entitled *Champagne Problems* is a visual dialogue between two kindred spirits – renowned celebrity photographer Jamie Nelson and musician Amy Taylor of *Amyl and the Sniffers*."). As a further example still, this Court has already considered Defendants' alleged statements on social media marketing the "fine art photography zines" featuring Plaintiff. *See* Complaint ¶ 26. This Court previously found that these circumstances did not plausibly meet prong two of *Rogers*. *See* Tentative Ruling at 14 of 15.

Moreover, many of Plaintiff's "expand[ed] [] factual allegations" do not allege facts at all, but rather present legal argument or bare legal conclusions. *See, e.g.*, SAC ¶¶ 51, ("Even if *arguendo*, Defendants' use of Plaintiff's name, identity, likeness, and persona is artistically relevant here, Defendants' use of the same was explicitly misleading because it falsely communicated endorsement, sponsorship, collaboration and authorization, thus serving as a commercial designation and marketing device for Defendants' goods and services in commerce."); 59 ("Accordingly, this case falls within the 'explicitly misleading' exception established by *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), because Defendants used Plaintiff's identity as a source identifier in a manner likely to confuse consumers as to endorsement or sponsorship. To this end, Defendants' use of Plaintiff's identity functions as trademark-like branding rather than expressive artistic attribution."). But "th[is] [C]ourt is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). "Nor is the [C]ourt required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988 (citing *id.*). Plaintiff's new allegations, *see* Opp. at 14 (summarizing and citing SAC ¶¶ 40, 50-8, 67), largely consist of such "merely conclusory [statements], unwarranted deductions of fact, or unreasonable inferences." For example, Plaintiff contends that its SAC alleges that Defendants "used Plaintiff's celebrity as the principal selling point for Defendants' merchandise and photography services" and "targeted Plaintiff's fan base in marketing the products." *See id.* But "none of the facts asserted in support of these legal conclusions actually justify the conclusions." *See Brown*, 724 F.3d at 1248 (affirming district court's determination that "[plaintiff] has failed to allege sufficient facts to make out a plausible claim that survives th[e] [*Rogers*] test"). The same is true for other new allegations identified by Plaintiff. *See* Opp. at 14.

The SAC does include new allegations that Plaintiff's fans were "actual[ly] confus[ed]," and includes screenshots in which "fans of [Plaintiff] express the belief that [Defendants'] prints were a 'joint collaboration' between [the parties]." SAC ¶ 57. These screenshots show, for example, an Instagram comment stating, "[W]hat do you mean? I couldn't find this information anywhere. I thought this was a joint collaboration?" in response to another comment that "Amyl don't approve of this sale btw. Don't buy." *See id.* These allegations are well-taken, but "allegations regarding the impact of the use are insufficient to show that a content creator explicitly misled consumers." *See Hara*, 2023 WL 6812769, at *4 (finding allegations by celebrity plaintiff that "her family, friends, fellow drag performers, and fans contacted her 'express[ing] confusion and concern about her connection with' [Netflix's work] . . . insufficient to satisfy the second prong of *Rogers*"); *see also Brown*, 724 F.3d at 1246 ("To be relevant, evidence must relate ***to the nature of the behavior of the identifying material's user, not the impact of the use***. Even if [plaintiff] could offer a survey demonstrating that consumers of the *Madden NFL* series believed that [he] endorsed the game, that would not support the claim that the use was explicitly misleading to consumers.") (emphasis added). As this Court observed previously, *see* Tentative Ruling at 14 of 15, "the slight risk that . . . use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and [in cases where there is no explicit misleading], the Lanham Act is not applicable." *Brown, 724 F.3d* at 1245 (citing *Rogers*, 875 F.2d at 999-1000) (alterations and ellipsis in original).

The Court must therefore reach the conclusion that, despite her new allegations, Plaintiff cannot survive the *Rogers* test. As such, the Court need not proceed to consider Plaintiff's arguments concerning likelihood of confusion, and would **GRANT**, with prejudice, Defendants' Motion with respect to this claim.[7]

**B. Misappropriation Claims**

Plaintiff's second cause of action is statutory misappropriation of publicity under California Civil Code § 3344; her third cause of action is common law misappropriation of name

---

[7] *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018), does not compel a different conclusion. That case merely stands for the proposition that the *Rogers* test is not a "mechanical test" and that this Court must consider "all of the relevant facts and circumstances" surrounding Defendants' alleged use. *See id.* at 269-70. This Court has imposed no "rigid requirement that, to be explicitly misleading, the defendant must make an 'affirmative statement of the plaintiff's sponsorship or endorsement." *See id.*

or likeness. *See* SAC ¶¶ 62-88. The Court will consider these two claims together. A claim for misappropriation of the right of publicity (sometimes referred to as a 'right of privacy') under California common law requires a plaintiff to prove: (1) "the defendant's use of the plaintiff's identity;" (2) "the appropriation of the plaintiff's name or likeness to the defendant's advantage commercially or otherwise;" (3) "lack of consent;" and (4) "resulting injury." *See Tubb v. Paramount Pictures Corp.*, No. 2:24-cv-01417-GW-(BFMx), 2024 WL 6943323, at *13 (C.D. Cal. June 28, 2024) (collecting cases). In addition to the common law claim, the California legislature has enacted a relevant statute. California Civil Code § 3344(a) provides in, in relevant part, that:

> [a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without that person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by them as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

Cal. Civ. Code § 3344(a)(1). "Photograph" means "any photograph or photographic reproduction, still or moving, or any videotape or live television transmission, of any person, such that the person is readily identifiable." *Id.* § 3344(b). "The elements of the common law claim are also included in a claim based upon Section 3344." *Tubb*, 2024 WL 6943323, at *14 (citing *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1138-39 (9th Cir. 2006)). "But the statutory claim also requires a plaintiff to prove 'knowing use' and 'a direct connection between the alleged use and the commercial purpose.'" *Id.* (collecting cases). Furthermore, "unlike the common law cause of action, section 3344 is apparently limited to commercial appropriations." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996).

Defendants contend that "Plaintiff's right of publicity claims are preempted by the Copyright Act" and should be dismissed. *See* Motion at 10. Plaintiff argues that there is no preemption, because "the SAC alleges commercial exploitation of Plaintiff's identity – not merely exploitation of copyrighted photographs." Opp. at 8. The Court agrees with Plaintiff.

"While the Copyright Act protects ownership of photographs, it does not protect the exploitation of one's likeness even if it is embodied in a photograph." *Young v. NeoCortext, Inc.*,

690 F. Supp. 3d 1091, 1101 (C.D. Cal. 2023), *aff'd*, No. 23-55772, 2024 WL 4987254 (9th Cir. Dec. 5, 2024) (citing *Downing*, 265 F.3d at 1004). In *Downing*, clothing retailer Abercrombie & Fitch developed a surfing theme for its catalog, which was the company's "largest advertising vehicle." *Downing*, 265 F.3d at 999. As part of this campaign, Abercrombie purchased photographs depicting the plaintiffs taking part in the 1965 Makaha International Surf Championship in Hawaii and used them in a section of the catalog without obtaining the plaintiffs' permission. *Id.* at 1000. The Ninth Circuit explained:

> The photograph itself, as a pictorial work of authorship, is subject matter protected by the Copyright Act. *See* 17 U.S.C. § 101 (providing that "pictorial, graphic, and sculptural works include . . . photographs.") However, it is not the publication of the photograph itself, as a creative work of authorship, that is the basis for Appellants' claims, but rather, it is the use of the Appellants' likenesses and their names pictured in the published photograph.

*Id.* at 1003. Later, in *Maloney v. T3Media, Inc.*, 853 F.3d 1004 (9th Cir. 2017), the Ninth Circuit clarified that "misuse of an individual's likeness is the 'basis' of a publicity-right claim when the name or image is exploited in advertising or on merchandise" and that "one's likeness does *not* form the basis of a publicity-right claim when 'the tort action challenges control of the artistic work itself,' . . . or involves 'the mere republication of the photograph.'" *Id.* at 1014 (emphasis in original) (internal citations omitted).

Plaintiff's claims do not appear to fall within the subject matter of copyright. Like the plaintiffs in *Downing*, Plaintiff does not expressly challenge the control of the Subject Photographs. *See, e.g.*, SAC ¶ 70 (disavowing that plaintiff's common law misappropriation claim is based upon Defendants' "reproduction or dissemination of any copyrighted work"). The SAC's claims are also not about the "mere republication" of the Subject Photographs. "[A] publicity-right claim is not preempted when it targets non-consensual use of one's name or likeness on merchandise or in advertising." *Maloney*, 853 F.3d at 1011. The Court would find that it is the unauthorized use of Plaintiff's name, image, and likeness to attract consumers and social media users, given Plaintiff's celebrity persona, to promote Nelson's photography services and products that is the crux of the Complaint. *See, e.g.*, SAC ¶ 65 ("On September 20, 2025, Plaintiff discovered Defendants were knowingly, and without Plaintiff's consent, using Plaintiff's identity, including her name, recognizable persona, and distinctive indicia of celebrity in connection with the marketing, advertising, and sale of merchandise and Defendants' photography services in California."). Therefore, the Court would not find that Plaintiff's claims are necessarily preempted

under the Copyright Act.

The Court would further note that Plaintiff, in part, bases her misappropriation claims on Defendants' alleged use of her name and image in such a manner as to suggest Plaintiff's "endorsement" beyond the collaboration between the parties that was necessary to produce the Subject Photographs in the first place. *See, e.g.*, *id.* ¶ 81 ("[D]efendants improperly used Plaintiff's identity in a manner specifically designed to suggest association, collaboration, or endorsement thereby converting Plaintiff's persona into a commercial product identifier for the sole benefit of Defendants."). Although the Court is dismissing Plaintiff's Lanham/False Association claim, the Ninth Circuit has stated that "California law has not imposed any requirement that the unauthorized use or publication of a person's name or [image] be suggestive of an endorsement or association with the injured person" and that this caveat "applies to both the common law and statutory causes of action." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996). Accordingly, the Court's dismissal of Plaintiff's Lanham Act claim does not bar her misappropriation claims.

**C. Breach of Implied License Claim**

Plaintiff's fourth and final cause of action is for breach of implied license. *See* SAC ¶¶ 89-100. "Licenses are contracts governed by ordinary principles of state contract law." *Aardwolf LLC v. Aardwolf Industries Sole Member LLC*, No. CV 14-9556-GW-(JEMx), 2016 WL 6822750, at *7 (C.D. Cal. May 2, 2016) (internal quotations omitted). Under California law, an implied-in-fact contract requires the same elements as an express contract, namely mutual assent, consideration, performance, breach, and damages. *See Smith v. Sabre Corp.*, No. 2:17-cv-05149-SVW-(AFMx), 2017 WL 11678765, at *4 (C.D. Cal. Oct. 23, 2017). Mutual assent may be "shown by the acts and conduct of the parties, interpreted in light of the subject matter and surrounding circumstances." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 681 (1988).

Plaintiff provides numerous well-plead factual allegations in support of its claim, which the Court must accept as true. *See Sprewell*, 266 F.3d at 988. Plaintiff contends that in July 2024, the manager of the Band contacted Defendants "requesting that she photograph the Band's members" for use in the Band's upcoming album, future documentaries, artwork, and for the Band's website and social media accounts. *See* SAC ¶ 14. From July 2024 through August 2024, the parties negotiated, but were "unable to reach an agreement," because "the Band expressly communicated to [Defendants] it was not amenable to [Defendants'] use of the Band's name,

image, and likeness on branded merchandise" or to "promote [Defendants'] photography business." *See id.* ¶ 15. Months later, on March 29, 2025, Defendant Jamie Nelson "contacted [Plaintiff] to request that [she] pose for a photoshoot in May 2025 (the "Subject Photoshoot"). *See id.* ¶ 16. The Subject Photoshoot was "to be conducted by Defendants with the express intention that the resulting images of [Plaintiff], along with her [NIL], would be published *exclusively* in connection with the July 2025 issue of *Vogue Portugal*." *Id.* Plaintiff alleges that at this point, the "parties entered an implied-in-fact contract . . . whereby Plaintiff granted Defendants a limited, conditional license to photograph Plaintiff and use the resulting images solely for editorial publication in *Vogue Portugal*." *See id.* ¶ 17. "Plaintiff's agreement to participate in the Subject Photoshoot was conditioned on that Implied License." *Id.*

Following the completion of the Subject Photoshoot and the publication of the resulting images in *Vogue Portugal*, on September 4, 2025, Defendant sent Plaintiff and the Band's manager "a presentation of elected images and indicated that she wanted to commoditize [Plaintiff's] name, image, and likeness by selling them via various merchandise on Defendants' Websites as purported 'fine art' prints." *See id.* ¶¶ 19-20. Plaintiff contends that in doing so, "Defendants confirmed they understood the limited scope of the Implied License and that they required separate licensing for their requested commercial exploitation, or expansion of that existing agreement." *See id.* ¶ 20. Plaintiff alleges that on September 15, 2025, the Band's manager wrote to Defendants:

> It was our understanding that the images were commissioned by and for Vogue Portugal, and [Ms. Taylor] agreed to do the shoot on that basis only . . . . I cannot be clearer about this – [Ms. Taylor] does not want you to sell images of her face, or her body as fine art prints. If you had been transparent with her in advance of the shoot about your desire/intentions to sell the photos, she would have said no to the shoot. If you had any notion or desire to sell pictures of [Ms. Taylor] to recoup your costs, you should have disclosed this beforehand. We simply would have said no to the shoot.

*Id.* ¶ 28. Despite this, Plaintiff alleges that five days later, on September 20, 2025, "Plaintiff discovered that Defendants were indeed selling merchandise containing [Plaintiff's] NIL on their Website, and otherwise using [Plaintiff's] NIL to directly or indirectly promote Defendants' commercial enterprises," including "uploading [Plaintiff's] NIL" onto their Instagram and Facebook accounts for commercial purposes. *See id.* ¶¶ 29-31. Plaintiff also provides additional allegations detailing her legal counsel's notifying Defendants of their allegedly improper conduct, and Defendants' alleged refusal to cease and desist. *See id.* ¶¶ 32-35.

The Court finds that, based on these detailed allegations, Plaintiff has sufficiently plead a

plausible claim for breach of implied-in-fact contract. Defendants contend that the "SAC fails to allege an enforceable agreement," and that even if Plaintiff's allegations are assumed true, they "acknowledge that the parties never agreed on merchandise terms." The Court disagrees. Based on Plaintiff's allegations, the Subject Photoshoot was to be conducted by Defendants with "the express intention that the resulting images of [Plaintiff], along with her name and likeness . . . would be published ***exclusively*** in connection with the July 2025 issue of *Vogue Portugal*." *See* SAC ¶16 (emphasis added). Moreover, Plaintiff further included allegations of the parties' conduct in a prior negotiation, specifically, that Plaintiff and the Band previously "explained to [Defendants] [] [that] the Band was zealously protective of their image and did not want the proposed photographs used for non-Band-sanctioned, private commercial purposes of [Defendants'] self-promoted band merchandise." *Id.* ¶ 15. Defendants argument that there "was no written agreement," *see* Motion at 13, is unavailing because an implied-in-fact contract is, just that, a contract derived from the circumstances surrounding the parties conduct, rather than an express written agreement.

Defendants next appear to contend that Plaintiff's breach of implied-in-fact contract claim is also preempted by the Copyright Act. Specifically, Defendants argue that "the claim is [] untenable because Plaintiff's alleged 'implied license' claims, in effect, precisely the kind of transfer of exclusive rights that, to be valid, *requires a written transfer* under 17 U.S.C. § 204" and that Plaintiff's alleged license "gives her absolute control over 'exclusive rights' held by a copyright owner under 17 U.S.C. § 106," such as the right to reproduce or display copyrighted works. *See* Motion at 13-14. But as discussed above, Plaintiff "does not allege that she owns the copyrights in the [S]ubject [P]hotographs," "does not allege that Defendants transferred any copyright interest to her;" and "does not seek to invalidate Defendants' copyrights." *See* Opp. at 7. Rather, Plaintiff's contract claim concerns the Parties' alleged agreement "to use Plaintiff's identity only for a specific editorial purpose" and purported breach of that agreement by Defendants' "exploiting her name, image, and likeness in [unauthorized] ways." *See id.*[8]

[8] While Defendants cite to statutes concerning the transfer of exclusive rights under the Copyright Act, there appears to be a semantic mix-up here based on Plaintiff's use of the term "license." Plaintiff, by her own concession, does not contend that she has been granted any sort of copyright "license" by Defendants. Rather the "license" simply refers to the parties' "implied-in-fact contract . . . whereby Plaintiff granted Defendants" permission to "photograph Plaintiff and use the resulting images solely for editorial publication in *Vogue Portugal*." SAC ¶ 17.

The Court agrees that if Plaintiff's contract action were based entirely on Defendants' exercise of their exclusive rights under the Copyright Act (*i.e.*, the right to display, reproduce, and creative derivative works based upon the Subject Photographs), the claim would likely be preempted. And the Court is, at this stage, somewhat skeptical of Plaintiff's claim because it appears to be, in no small part, based on Defendants' mere reproduction and display of the Subject Photographs, their own copyrighted work.[9] *See, e.g.*, SAC ¶ 96 ("Defendants materially breached the Implied License by exploiting Plaintiff's identity and ***images*** beyond the agreed upon editorial purpose, including monetizing the ***images as commercial goods and using them to promote Defendants'*** services.") (emphasis added)). However, the claim also appears to be based on Defendants' alleged commercial use of Plaintiff's "name" and "persona" outside of the *Vogue Portugal* feature in breach of the parties' alleged agreement that Defendants' use of "Plaintiff's name, image, likeness, and persona" would be limited to use for the "editorial purpose" of Plaintiff's feature in *Vogue Portugal*. *See* SAC ¶ 91; *see also id.* ¶ 99 ("Defendants breached that Implied License by exceeding its scope and, in connection therewith, monetizing Plaintiff's identity, including her name, likeness, and persona for Defendants' commercial benefit."). Moreover, the SAC does include examples of Defendants using Plaintiff's name in the context of advertising. *See, e.g.*, SAC ¶¶ 30-31 (Defendants' social media posts containing Plaintiff and the Band's name in the context of advertising products). At this early stage, the Court cannot conclude that Plaintiff's contract claim is entirely preempted.[10] Defendants are free to, with the benefit of a more developed record, re-raise their preemption arguments at a later stage, such as on summary judgment.

## IV. Conclusion

Based on the foregoing discussion, the Court would **GRANT-IN-PART** the Motion and

---

[9] The Court would suggest that, at the upcoming hearing, Plaintiff consider providing the Court with examples of Defendants' conduct beyond Defendants' mere exercise of their exclusive rights under the Copyright Act which Plaintiff believes breached the parties' implied-in-fact contract.

[10] Defendants also contend that "exceeding the scope of a license is a tort, not a breach of contract" and that under California law, a plaintiff may not "plead[] around doomed claims by couching tort claims as contract claims." Motion at 14. But Defendants' cited cases merely stand for the proposition that a plaintiff may not alchemize a claim otherwise barred by the statute of limitations into a timely claim merely by renaming it. *See e.g.*, *Jefferson v. J.E. French Co.*, 54 Cal.2d 717 (1960) (plaintiff's claim for money pursuant to an oral employment contract is still time-barred, despite plaintiff's complaint seeking equitable accounting because "the primary purpose of the action is to recover money under the oral contract, and the nature of the right sued upon, not the form of action or the relief demanded, determines the applicability of the statute of limitations").

dismiss, with prejudice, Plaintiff's claim for False Association under the Lanham Act, but the Court would **DENY-IN-PART** the Motion with respect to Plaintiff's misappropriation and breach of implied-in-fact contract claims.